THOMAS LINDSTROM CO.,
INC., Petitioner

v.

WORKERS' COMPENSATION
APPEAL BOARD (BRAUN),
Respondent.

John Braun, Petitioner

v.

Workers' Compensation Appeal
Board (Thomas Lindstrom
Co., Inc.), Respondent.

Commonwealth Court of Pennsylvania.

Submitted on Briefs March 12, 2010.
Decided April 13, 2010.

Howard H. Soffer, Bensalem, for petitioner, Thomas Lindstrom Co., Inc.

Edward J. Carreiro, Jr., Colmar, for respondent, John Braun.

BEFORE: PELLEGRINI, Judge, and BUTLER, Judge, and KELLEY, Senior Judge.

OPINION BY Judge PELLEGRINI.

Thomas Lindstrom Co., Inc. (Employer) appeals from an order of the Workers' Compensation Appeal Board (Board) vacating the portion of the Workers' Compensation Judge's (WCJ) decision denying the Claim Petition of John Braun (Claimant) under Section 301(a) of the Workers' Compensation Act (Act)[1] because Employer successfully presented an intoxication defense. Claimant appeals the portion of the order of the Board affirming the decision of the WCJ to deny his petition for reinstatement of benefits because the Notice of Temporary Compensation Payable (NTCP) did not convert into a Notice of Compensation Payable (NCP).

This case has a long, complicated procedural history. On November 29, 2002, Claimant was working for Employer as an ironworker. He was standing on a six to eight-inch-wide girder attempting to guide a steel beam into place when he overreached and fell, landing on a concrete slab approximately 25 feet below. Claimant landed predominantly on his head and sustained multiple injuries, including severe head trauma and loss of function in his arms and legs. He filed a Claim Petition seeking payment for ongoing full disability, medical bills, counsel fees, specific loss, and disfigurement. Employer filed an Answer denying all material allegations. Employer issued Claimant an NTCP on December 17, 2002, according to which Claimant was to receive biweekly payments of $662 beginning on November 30, 2002. A Notice of Workers' Compensation Denial (NCD) was issued to Claimant on February 21, 2003, stating his claim was denied for other good cause. Specifically, Employer's investigation showed Claimant was under the influence of an excessive amount of alcohol at the time of the injury. Claimant then filed a Petition to Reinstate Compensation Benefits alleging Employer failed to send Notice Stopping Temporary Compensation Payable (NSTCP) within five days after the date of last payment in violation of Section 406.1 of the Act.[2]

---

1. Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 431. Section 301(a) provides, in pertinent part:

In cases where the injury or death is caused by intoxication, no compensation shall be paid if the injury or death would not have occurred but for the employe's intoxication,

but the burden of proof of such fact shall be upon the employer.

2. 77 P.S. § 717.1(d)(5)(i), added by Section 3 of the Act of February 8, 1972, P.L. 25, *as amended.* That section provides, in pertinent part:

If the employer ceases making payments pursuant to a notice of temporary compen-

Before proceeding to a hearing, the parties entered a Stipulation of Facts in which they stipulated that a falling incident occurred on November 29, 2002; Claimant sustained a work-related injury; an employment relationship existed; and the incident occurred within the course and scope of Claimant's employment. The parties also stipulated to the issuance and dates of the NTCP, NSTCP, and NCD. Therefore, the only remaining issues to be resolved were Employer's intoxication defense and whether Claimant was entitled to a reinstatement of benefits because Employer did not send the required notice within five days of ceasing to make temporary compensation payments as required by Section 406.1 of the Act.

Before the WCJ, Employer presented the deposition testimony of John Shane, M.D. (Dr. Shane), a physician board certified in clinical and anatomical pathology as well as chemistry and toxicology. Dr. Shane stated that Employer's insurer requested that he review Claimant's records from Frankford Hospital, from his admission on November 29, 2002, throughout his extensive treatment and hospitalization. According to these records, Claimant's accident occurred approximately 45 minutes after he returned from his lunch break. Claimant was attempting to guide a steel beam into place when he overreached and fell approximately 25 feet onto a concrete pad. Claimant was unresponsive after the accident and had to be intubated. The records indicated that Claimant suffered numerous injuries as a result of this fall, including the following: a vascular skull fracture to the base of the skull; right orbital fracture; multiple cerebral contusions; intraventricular hemorrhage; contusions to his lungs; and fractures of his maxillary sinus, first rib, right distal radius, and left metacarpals.

Claimant's records indicate that upon arrival at Frankford Hospital at 1:44 p.m., he had alcohol on his breath and the admitting physician noted that he had a problem with alcohol and substance abuse; therefore, alcohol and substance abuse screening was immediately requested. A blood specimen was drawn at 2:02 p.m. which indicated a serum ethanol level of 321 milligrams per deciliter. Dr. Shane calculated these results to mean that Claimant's whole blood alcohol level when the sample was taken was .23 to .29% with an average of .27%, and at the time of the fall it would have been slightly higher, approximately .28%. Dr. Shane testified that this level of blood alcohol would produce the following physical impairments: slowed responses; some slurring of speech; grossly impaired fine motor movements; impaired gross motor movements with some early staggering; loss of reflexes; loss of caution; 80 to 90% loss of peripheral vision; 70% loss of hearing; loss of deductive reasoning skills; loss of focus; and an extremely short attention span. Dr. Shane concluded that at the time of Claimant's accident, he was "a very, very significantly alcohol intoxication disabled person." When asked to give his opinion, with a reasonable degree of medical or toxicological certainty, as to the causal relation of the alcohol in Claimant's bloodstream and his fall, Dr. Shane stated that "without question, that this person was severely intoxicated by alcohol and that level of alcohol was a major and very substantial contributing factor to his unfortunate accident." (R. at 39a).

Dr. Shane testified that Frankford Hospital's laboratory was licensed as a blood

sation payable, a notice in the form prescribed by the department shall be sent to the claimant and a copy filed with the department, but in no event shall this notice be sent or filed later than five (5) days after the last payment.

alcohol testing laboratory by the Commonwealth, fully approved and accredited by the College of American Pathologists, and that it had the highest levels of reliability of testing, quality assurance testing, and regulatory certification possible.

Employer also submitted the written report of Dr. Shane in which he stated that at the time of the accident, Claimant had a minimum of 12 ounce equivalents of alcohol in his system, which would equal 12, 12-ounce beers or 12 ounces of 86 proof spirits. Given these levels, Dr. Shane concluded that Claimant's "impairments and in particular his profound gross motor movement disability; loss of balance; loss of caution; loss of reasoning; loss of peripheral vision; his obtundation and essentially absent attention span *were the disabilities that caused this accident.* John Braun was severely and heavily intoxicated.... *Catastrophe was a certainty* in attempting to perform the job function described (or any construction job function) with his enormous alcohol burden." (R. at 129a–130a) (emphasis added).

Due to his condition Claimant was unable to testify before the WCJ. However, he presented the deposition testimony of Lee M. Blum, Ph.D. (Mr. Blum), a board certified forensic toxicologist and assistant laboratory director. Mr. Blum testified that he reviewed copies of laboratory reports and emergency room records regarding Claimant's admission to Frankford Hospital, as well as the report and deposition of Dr. Shane. From his review of these materials, Mr. Blum determined that

Claimant began work on November 29, 2002, at 7 a.m. and went to a local restaurant for lunch from 12:00 to 12:30 p.m. Shortly after 1:00 p.m., Claimant fell approximately 25 feet to the ground. Claimant arrived at the emergency room at Frankford Hospital at 1:44 p.m. and at approximately 2:00 p.m. alcohol and urine toxicology testing was requested because Claimant had the smell of alcohol on his breath. Claimant's urine toxicology screen was positive for marijuana and barbiturates [3] and his laboratory report indicated a blood alcohol of 321 milligrams per deciliter.

Mr. Blum also testified at length as to the appropriate process in the Commonwealth for taking blood samples in order to make a determination of blood alcohol levels.[4] He testified that nothing in the documents he reviewed indicated the training of the person who drew Claimant's blood sample, whether the proper procedures were followed when Claimant's blood sample was obtained and tested, whether the integrity of the specimen was maintained, whether an approved method of testing was utilized, and the chain of custody of the sample was not provided. Mr. Blum testified that the laboratory results indicated the blood alcohol test was "considered as a presumptive positive" and that no secondary test was completed to determine whether the substance was in fact ethyl alcohol. Based upon all of this information, he concluded that the test for ethyl alcohol performed on Claimant did not meet the standards of practice in the Com-

---

**3.** While Claimant's initial urine screen was positive for these substances, follow-up testing was never completed to determine the actual levels present within his system.

**4.** According to Mr. Blum, a practicing physician must order the testing and the specimen must be taken by an individual trained in the drawing of blood alcohol specimens. The specimen must be labeled to ensure its integrity and it is then transported to the laboratory for testing. The laboratory must document that the specimen has been received and testing must be performed by qualified, trained personnel using an approved method such as gas chromatography, enzymatic analysis, or micro diffusion and distillation.

monwealth or the necessary degree of scientific certainty required for forensic purposes.

Claimant also presented the live testimony of Robert Hendrickson (Mr. Hendrickson). Mr. Hendrickson was working as a crane operator on the same crew as Claimant on the day of the accident. He testified that he observed Claimant standing and walking along a long span, which was approximately six to eight inches wide, for approximately half an hour prior to his fall and that during this time Claimant did not stagger, sway, or lose his balance. According to Mr. Hendrickson, Claimant was able to secure three or four beams prior to his fall. On cross-examination, Mr. Hendrickson admitted that he was a friend of Claimant's father and had known him for 30 years. He did not go to lunch with Claimant on the day of the accident and did not know what Claimant had to eat or drink for lunch.

The WCJ denied Claimant's Claim Petition, finding that Employer successfully presented an intoxication defense and was not liable for Claimant's work related injury. The WCJ reviewed the testimony of both Dr. Shane and Mr. Blum and found that only Dr. Shane's testimony addressed the critical issues of the quantity of alcohol in Claimant's system, the anticipated effects of that quantity of alcohol, and the relationship between the amount of alcohol in Claimant's system and his fall. The WCJ found Dr. Shane's testimony on these issues competent and credible, and she accepted his testimony over that of Mr. Blum where their testimony differed. The WCJ credited Dr. Shane's testimony as to the fact that Claimant had a blood alcohol level of approximately .28% at the time of the fall, and the physical results of such a high level of alcohol would include slowed responses, impairment of fine motor movements, impaired gross motor movements

with some staggering, loss of reflexes, sensory loss, significant loss of peripheral vision and hearing, and lack of alertness. In addition, the WCJ found that no evidence was submitted to discredit the laboratory results from Frankford Hospital.

The WCJ also dismissed Claimant's Petition to Review Compensation Benefits as moot and denied his Petition to Reinstate Compensation Benefits, finding Employer did not violate Section 406.1 of the Act because it did not fail to send the notice within five days. Claimant argued Employer violated Section 406.1 because it failed to send the NSTCP within five days after the date of the last payment and the NTCP automatically converted to an NCP. However, Claimant was paid benefits continually from the date of injury and these payments were made at the beginning of each two-week period for which benefits were due, rather than at the end. Even though Claimant received his last payment on February 11, 2003, this covered the upcoming two-week period ending on February 20, 2003. Therefore, the NSTCP which Claimant received on February 21, 2003, was timely because it was sent within five days of the end of the last payment period. Claimant then appealed to the Board.

The Board determined that the WCJ did not err in finding that the NTCP did not convert into an NCP and affirmed the portion of the WCJ's decision denying Claimant's Reinstatement Petition and dismissing his Review Petition. The Board relied upon this Court's decision in *Gereyes v. Workers' Compensation Appeal Board,* 793 A.2d 1017 (Pa.Cmwlth.2002), and concluded that where an employer "pays benefits in advance, the relevant date for calculating the date of last payment is the last date through which the claimant is scheduled to receive benefits." Because the last day of the payment cycle

for which Claimant was to receive benefits was February 20, 2003, and the NSTCP was issued on February 21, 2003, the notice was timely and there was no Section 406.1 violation.

The Board vacated the portion of the WCJ's decision denying the Claim Petition because the WCJ applied an incorrect intoxication defense standard needed to be made out by an employer under Section 301(a) of the Act, i.e. that injury or death would not have occurred *but for* the employee's intoxication, and there was insufficient evidence to establish this defense. The Board noted that in *Mahon v. Workers' Compensation Appeal Board,* 835 A.2d 420 (Pa.Cmwlth.2003), we held that the General Assembly's use of the term "but for" in the Act meant that an employer must establish "intoxication was the *cause in fact* of an injury." *Mahon,* 835 A.2d at 429 (emphasis added). According to the Board, even though Dr. Shane testified that Claimant's intoxication "was a major and very substantial contributing factor to his unfortunate accident," he never conclusively opined that the accident occurred *because of* his intoxication. Therefore, Dr. Shane's testimony was not adequate to prove that Claimant's intoxication was the cause in fact of his injury, and Employer failed to meet its burden of proof. The Board then remanded the case to the WCJ to make findings regarding the extent of Claimant's injury and whether he was disabled.

On remand, the WCJ determined that given the language used by the Board, she lacked discretion to entertain Employer's intoxication defense again and could not take additional evidence on any issues other than the extent of Claimant's disability and description of his injuries. Therefore, she accepted Employer's representation that Claimant had been *disabled* since the date of his accident and accepted Employer's lengthy, severe description of injury. In her conclusions of law, the WCJ stated, "[a]s directed by the WCAB, the undersigned finds that Employer has failed to present a defense of intoxication." Accordingly, the WCJ granted Claimant's Claim Petition, dismissed his Petition to Review Compensation Benefits as moot, and again denied his Petition to Reinstate Compensation Benefits for the reasons outlined above. Both Claimant and Employer appealed to the Board, which affirmed the WCJ's decision but remanded for additional findings concerning unreasonable contest attorneys' fees and litigation costs.

Again on remand, the WCJ found that Employer presented a genuine issue of fact and the contest was not brought merely for purposes of harassment. Therefore, the contest to the original Claim Petition was reasonable and Claimant's claim for unreasonable contest attorneys' fees was denied. She also determined that because Claimant was ultimately successful in his Claim Petition, he was entitled to reimbursement from Employer for litigation costs under Section 440(a) of the Act[5] in

5.  77 P.S. § 996(a). Section 440(a) provides as follows:
    In any contested case where the insurer has contested liability in whole or in part, including contested cases involving petitions to terminate, reinstate, increase, reduce or otherwise modify compensation awards, agreements or other payment arrangements or to set aside final receipts, the employe or his dependent, as the case may be, in whose

favor the matter at issue has been finally determined in whole or in part shall be awarded, in addition to the award for compensation, a reasonable sum for costs incurred for attorney's fee, witnesses, necessary medical examination, and the value of unreimbursed lost time to attend the proceedings: Provided, That cost for attorney fees may be excluded when a reasonable

the amount of $7,218.33.[6]  Again, both Claimant and Employer appealed to the Board which affirmed, and this appeal followed.[7]

Employer contends that, based on the WCJ's findings, it had successfully presented an intoxication defense as set forth in Section 301(a) of the Act. In *Mahon,* we addressed what was needed to establish the intoxication defense and held that the General Assembly's use of the term "but for" in the Act meant that an employer asserting an employee's intoxication as an affirmative defense must establish "that intoxication was the cause in fact of an injury."  In negligence actions, but for causation or the cause in fact standard requires a direct causal connection between the individual's negligence and the injury sustained, meaning that "the harmful result would not have come about but for the negligent conduct."  *First v. Zem Zem Temple,* 454 Pa.Super. 548, 686 A.2d 18 (1996) (citing *E.J. Stewart, Inc. v. Aitken Products, Inc.,* 607 F.Supp. 883 (E.D.Pa.1985)).  However, we have repeatedly held that when delivering a causation opinion in a workers' compensation case, a doctor or medical expert is not required to use magic words such as "sub-

stantial contributing factor," "materially contributed," or in this case, "cause in fact."  *Yanish v. Workers' Compensation Appeal Board (Bethlehem Mines Corp.),* 96 Pa.Cmwlth. 545, 507 A.2d 1302, 1303 (1986) (citing *Workmen's Compensation Appeal Board v. Bowen,* 26 Pa.Cmwlth. 593, 364 A.2d 1387 (1976)).  Rather, "[i]t is only necessary that the doctor's testimony permit a valid inference that such causation was present."  *Yanish,* 507 A.2d at 1303–04.  We certainly did not intend to require the use of "magic words" when issuing our opinion in *Mahon,* as we stated that an employer's "sole burden was to convince the fact finder, by competent and substantial evidence that Claimant would not have fallen and sustained his injuries had he not been intoxicated."  *Mahon,* 835 A.2d at 429.  We made it clear that it was up to the fact finder to infer from the evidence as a whole whether a claimant's intoxication caused his injury.

In that case, the claimant was a window washer who fell approximately 18 feet from a ladder while cleaning a second-story window causing him to break both ankles.  When the claimant arrived at the hospital to be treated, it was reported that he had a history of alcoholism and he admitted to consuming two beers prior to

---

basis for the contest has been established by the employer or the insurer.

6.  Notably, the WCJ made the following findings of fact in both her original and amended decisions issued on May 22, 2008:
3.  Based on the acceptance of the testimony of John Shane, MD, the undersigned found that Employer had presented a viable defense of intoxication.  The undersigned did so based on her interpretation of Dr. Shane's testimony as a whole.
4.  In order to succeed with a defense of intoxication, an employer must present evidence to meet the "but for" standard.  Although Dr. Shane's actual language did not contain the "magic words," the undersigned accepted his testimony to be tantamount to the "but for" standard.

5.  This matter was appealed to the Workers' Compensation Appeal Board, which reversed the ultimate determination and remanded for additional findings.
6.  The undersigned maintains that Dr. Shane's testimony is subject to interpretation and such an interpretation was required by the undersigned as well as the Workers' Compensation Appeal Board.

7.  Our review of a decision of the Board is limited to determining whether errors of law were made, constitutional rights were violated or whether the necessary findings of fact are supported by substantial evidence.  *Ward v. Workers' Compensation Appeal Board (City of Philadelphia),* 966 A.2d 1159 (Pa.Cmwlth. 2009).

his fall. The hospital performed blood chemistry tests which indicated that he had a blood alcohol level of 238 milligrams per deciliter. The claimant began receiving compensation benefits, but his employer and its insurer later asserted an intoxication defense. In support of this defense, the employer submitted the deposition testimony of a physician certified in clinical toxicology who testified to the physical impairments caused by this high level of intoxication and who concluded that if the "claimant had not consumed as much alcohol as he did, he would not have fallen." *Id.* at 423. The claimant denied consuming this level of alcohol, and his co-worker and employer testified that he did not appear to be intoxicated. The WCJ did not believe claimant's testimony that he only consumed two beers prior to falling, and he found the toxicologist to be credible. The WCJ concluded that claimant's intoxication was the cause of his injuries and he was not entitled to workers' compensation benefits.

The claimant in *Mahon* appealed to the Board which affirmed and then appealed to this Court arguing that the toxicologist's testimony only established that his level of intoxication made it more likely that he would fall off a ladder, not that it in fact caused his fall. However, we held that because the employer presented evidence that claimant was intoxicated at the time of his fall, the WCJ accepted the competent testimony of the toxicologist that the claimant would not have fallen had he not been so extremely impaired, and because there was no credible evidence put forward regarding an alternative reason for the claimant's fall, the employer had satisfied its burden of proof. *Id.* at 430. We also specifically rejected the claimant's argument that employer was required to establish the existence of negative facts proving that no other condition caused the claimant's fall. *Id.*

■ This case is factually very similar to that of *Mahon*. When Claimant arrived at Frankford Hospital, he had alcohol on his breath and it was noted that he had a problem with alcohol and substance abuse. His blood alcohol level was 321 milligrams per deciliter, even higher than the claimant in *Mahon*. Dr. Shane testified that this translated to approximately .28%, more than three times the legal limit for driving within the Commonwealth. He also testified to the severe physical impairments of such a high blood alcohol level, and that "a major and very substantial contributing cause of the accident was Claimant's severe intoxication by alcohol." While the WCJ did not specifically reference the written report submitted by Dr. Shane in her findings and conclusions, this report was submitted to the WCJ as an attachment to his deposition testimony and is part of the original record. Dr. Shane's written report included his conclusions that Claimant's severe impairments due to his enormous alcohol burden "were the disabilities that *caused this accident*" and "*[c]atastrophe was a certainty* in attempting to perform the job function described (or any construction job function) with his enormous alcohol burden." (R. at 129a, 130a). The WCJ found Dr. Shane's testimony to be competent and credible, including his statements that such a high level of intoxication would result in severe physical impairments, including slowed responses, impairment of both fine and gross motor movements, staggering, loss of reflexes, loss of peripheral vision, and lack of alertness. These impairments would be catastrophic given the fact that Claimant was working 25 feet high up in the air, attempting to walk along a six to eight-inch wide girder with no support system in place. Like the toxicologist in *Mahon*, Dr. Shane's written report contained his conclusions, within a reasonable degree of

medical or toxicological certainty, that the impairments resulting from Claimant's enormously high blood alcohol level "were the disabilities that caused this accident" and that "catastrophe was a certainty" in this case. Moreover, just because Dr. Shane did not use the phrase "cause in fact" is of no moment as medical experts do not need to use such phrases in their testimony. The key is whether the evidence as a whole is enough to support an inference of causation. The recounting of Dr. Shane's testimony established that Claimant's intoxication was the "cause in fact" because it satisfies the *Mahon* test by convincing the WCJ that Claimant would not have fallen had he not been intoxicated. Therefore, we vacate this portion of the Board's order and affirm the initial decision of the WCJ denying benefits because Claimant's injury was caused by his intoxication. Because the issue regarding the intoxication defense is finally decided in favor of Employer, Claimant is not entitled to litigation expenses and we reverse the Board's award of litigation expenses to Claimant.

Finally, Claimant filed a cross-appeal in this matter in which he argues that the Board committed an error of law by holding that the relevant date for determining the timeliness of a notice for termination of temporary benefits under Section 406.1 of the Act is the last day of the payment cycle. Section 406.1 mandates that in order for a notice stopping payment to be timely, it must be sent or filed no later "than five (5) days after the last payment." 77 P.S. § 717.1(d)(5)(i). According to Claimant, he received his last payment on February 11, 2003, and because he did not receive the NSTCP until February 21, 2003, it was not timely. However, Claimant's argument fails to acknowledge that Employer was paying his benefits at the beginning of each payment period, and that the last day of his final payment period was in fact February 20, 2003, the day before he received the NSTCP. As the Board stated, it would not make sense and it would not serve the purposes of the Act to penalize an employer for pre-paying an employee's benefits. Because Employer filed the NSTCP less than five days after the last payment period ended, the Board was correct in holding Employer did not violate Section 406.1 and the NTCP did not convert to an NCP.

***ORDER***

AND NOW, this *13th* day of *April,* 2010, the portion of the order of the Workers' Compensation Appeal Board reversing the Workers' Compensation Judge's decision denying benefits to Claimant is reversed. The portion of the August 27, 2009 order of the Workers' Compensation Appeal Board awarding litigation costs to Claimant is reversed and the portion denying unreasonable contest attorneys' fees is affirmed.