The PENNSYLVANIA STATE UNIVERSITY and The PMA Insurance Group, Petitioners

v.

WORKERS' COMPENSATION APPEAL BOARD (Rabin, Deceased), Respondent.

Commonwealth Court of Pennsylvania.

Submitted on Briefs May 18, 2012.

Decided Aug. 15, 2012.

Reargument Denied Oct. 12, 2012.

Michael P. Routch, Hollidaysburg, for petitioners.

Elliot A. Strokoff, Harrisburg, for respondent Sandra Rabin.

BEFORE: COHN JUBELIRER, Judge, and McCULLOUGH, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Senior Judge FRIEDMAN.

The Pennsylvania State University (Penn State) and The PMA Insurance Group (collectively, Employer) petition for review of a Workers' Compensation Appeal Board (WCAB) order, dated November 18, 2011, which affirmed the decision of a workers' compensation judge (WCJ) awarding fatal claim benefits to Sandra Rabin (Claimant). We affirm.

At the time of his death, Dr. Jack Rabin (Decedent) worked for Penn State as a professor of public administration. In June 2007, Claimant filed a fatal claim petition, which alleged that Decedent's death on November 13, 2006, stemmed from work-related injuries that he sustained on October 20, 2006. (See WCJ's Findings of Fact, Nos. 1–2.) The WCJ held several hearings in this matter, with Claimant and Theodore Aaron Wachhaus, Jr. (Wachhaus) testifying on behalf of Claimant. Claimant also introduced the deposition testimony of Dr. Joseph Acri, a board-certified internist and one of Decedent's treating physicians, in support of her claim, while Employer, in support of its position, presented the deposition testimony of Dr. Scott Manaker, a board-certified internist, pulmonary disease and critical care specialist, who reviewed Decedent's medical records at Employer's request.

The WCJ found in relevant part as follows. Dr. Acri began treating Decedent in the summer of 2000. At that time, Decedent suffered from lymphedema,[1] uncontrolled diabetes, hypertension, difficulty breathing, cardiac problems and cellulitus of the legs. Under Dr. Acri's care, Decedent's kidney function and diabetes levels improved, the number and seriousness of his infections were reduced, and the amount of oxygen he needed was reduced. Dr. Acri also successfully treated Decedent for infections over the course of years. In April 2006, Decedent underwent a stenting procedure for which he required only routine three-month check-ups. Dr. Acri examined Decedent in August 2006 and determined that he was in excellent condition and did not require any supplementary oxygen. In September 2006, Decedent was able to lead religious services at his house of worship, which required him to chant and stand for several-hour intervals. (WCJ's Findings of Fact, Nos. 5–10.)

Starting in the summer of 2003, Wachhaus became a doctoral student in Penn State–Harrisburg's School of Public Affairs. After completing his Ph.D. coursework, Wachhaus prepared to present and defend his thesis before a dissertation committee, of which Decedent was the chairperson. Wachhaus worked closely with Decedent in crafting his dissertation. Wachhaus began meeting Decedent off campus in order to discuss his doctoral material because Wachhaus was teaching at Penn State–Harrisburg as an adjunct professor during the day, while Decedent was teaching at Penn State–Harrisburg at night. According to Wachhaus, he met with Decedent and other Penn State students in an off-campus restaurant setting approximately six to eight times during 2006 for teaching purposes and to discuss related topics and materials. (WCJ's Findings of Fact, Nos. 11–13, 15–16.)

On October 20, 2006, Decedent and Wachhaus met at Charlie Brown's restaurant in Harrisburg to finalize the outline for Wachhaus' dissertation. They arrived at about noon, were seated and placed

---

1. "Lymphedema" is "[s]welling (especially in subcutaneous tissues) as a result of obstruction of lymphatic vessels or lymph nodes and the accumulation of large amounts of lymph in the affected region." *Stedman's Medical Dictionary* 901 (25th ed.1990).

their orders, and Decedent then requested that their lunches be held until Decedent asked that they be brought to the table. For approximately one to one-and-one-quarter hours, Wachhaus and Decedent discussed in line-by-line, word-by-word detail the outline of Wachhaus' dissertation. Wachhaus then suggested that it was "high time" they begin eating, and both he and Decedent rose to visit the salad bar. While standing on one side of the salad bar, Wachhaus heard a loud crash and walked around to the other side, whereupon he discovered Decedent lying on the floor and groaning. Decedent complained about pain in his upper left chest, shoulder and arm, and he stated that he had caught his foot on something. An ambulance then took Decedent to Harrisburg Hospital's emergency room, where he was diagnosed with a left shoulder fracture/dislocation and left humeral shaft fracture.[2] According to Wachhaus, had Decedent not been injured, he fully expected their meeting to last until 3:00 p.m. and that, after they got their food, they would continue to discuss topics of public administration, methodological problems and other scholarly matters. (WCJ's Findings of Fact, Nos. 14, 17–22, 24–25.)

On October 20, 2006, the day of the incident, Dr. Robert J. Maurer performed a left shoulder closed relocation of the Decedent's arm fracture and shoulder dislocation. Dr. Maurer indicated in his operative report that possible infection was a risk of the procedure. Decedent was discharged from Harrisburg Hospital on October 21, 2006, but, on October 24, 2006, Decedent was admitted to Community General Osteopathic Hospital due to his complaints of left shoulder pain and ambu-

latory dysfunction. The orthopedic surgeons at Community General Osteopathic Hospital called Dr. Acri in for a consultation on October 26, 2006. At that time, Dr. Acri discovered Decedent in intense pain and cardiac and respiratory distress, and the doctor had Decedent immediately transferred to the intensive care unit. Decedent died on November 13, 2006, and, afterward, Dr. Acri concluded in his hospital summary: "The patient expired from multiple medical problems stemming from his unfortunate left upper extremity fracture." (WCJ's Findings of Fact, Nos. 26–31.)

According to Dr. Acri, Decedent's unchecked pain and stress, which were caused by his upper arm fracture and left shoulder dislocation, caused Decedent's kidneys and heart to fail and suppressed Decedent's immune system to the point where he succumbed to aseptic pneumonia. Dr. Acri compared the objective test results taken on Decedent's admission to Harrisburg Hospital on October 20, 2006, with the tests run on Decedent at Community General Osteopathic Hospital on October 25, 2006. Those results confirmed that Decedent's white blood cell count was slightly elevated on October 20, 2006, indicating the beginnings of a stress response, but that, by October 25, 2006, he had a worsening of kidney function and an elevated AST[3] indicating heart injury brought on by rapid atrial fibrillation due to stress and pain from Decedent's shoulder injuries. Dr. Acri summarized his testimony by stating that Decedent's fall and his broken arm and dislocated shoulder were the triggers leading to his death three weeks later. (WCJ's Findings of Fact, Nos. 32–34.)

2. The "humerus" is "[t]he bone of the arm, articulating with the scapula above and the radius and ulna below." *Stedman's Medical Dictionary* 727 (25th ed.1990).

3. According to Dr. Acri, AST "is one of the chemistries of the liver." (N.T., 12/14/07, at 28.)

Dr. Manaker, on the other hand, opined that Decedent's injuries, which were the result of his fall, did not cause his death. Even so, Dr. Manaker was not sure exactly what medical problem led to Decedent's death, stating: "An infection or an infection-like syndrome, or possibly multiple organ failure, one or the other or both." (WCJ's Findings of Fact, No. 38.) Dr. Manaker never examined Decedent, and he did not review any of Dr. Acri's records from 2006. He testified that he did not believe that Decedent required re-hospitalization on October 24, 2006. He agreed with Dr. Acri, however, that Decedent's renal and heart failures suppressed and compromised Decedent's immune system, predisposing him to infection. (WCJ's Findings of Fact, Nos. 36–37 and 41.)

The WCJ credited Wachhaus' testimony regarding the events surrounding Decedent's injury. (WCJ's Findings of Fact, No. 23.) He also credited Dr. Acri's testimony over the testimony of Dr. Manaker because "the correctness of Dr. Acri's decision to place [Decedent] into the ICU on October 26, 2006, was tragically confirmed by the future course of events, a future course which belied Dr. Manaker's opinion that [Decedent] did not require hospitalization on October 24, 2006," (WCJ's Finding of Fact, No. 44); "Dr. Acri's opinion was well supported by the objective test results comparing [Decedent's] status upon entering into Harrisburg Hospital on October 20, 2006, with the objective test results taken on October 25, 2006 and thereafter in Community General Osteopathic Hospital," (id.); and, "even if [Decedent's] death

was due to a hospital acquired ... infection which Dr. Manaker suggests was one possibility, [Decedent] would not have been in the hospital exposed to such infection but for his broken arm and dislocated shoulder," (id.).

Based on his findings, the WCJ concluded that Decedent was actually engaged in the furtherance of the business or affairs of Penn State when he fell and was injured at Charlie Brown's restaurant on October 20, 2006, and that he died as a result of those injuries. (WCJ's Conclusions of Law, Nos. 2–3.) The WCJ thus granted Claimant's fatal claim petition. On appeal by Employer, the WCAB affirmed. Employer's petition for review to this court followed.

■ On appeal,[4] Employer first argues that Claimant failed to meet her burden of proving that Decedent sustained his injuries on October 20, 2006, while in the course of his employment. In particular, Employer asserts that Decedent was a stationary employee who was on a lunch break at a public restaurant when he fell and, therefore, Decedent cannot be construed to have been actually engaged in the furtherance of his employer's business or affairs at the time of his injury. We are not persuaded by Employer's reasoning, which relies on its own version of the facts.[5]

■ We explained in *U.S. Airways v. Workers' Compensation Appeal Board (Dixon)*, 764 A.2d 635, 640 (Pa.Cmwlth. 2000) (citations omitted):

---

4. Our scope of review is limited to determining whether constitutional rights were violated, whether the adjudication is in accordance with the law and whether the necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704.

5. The WCJ is the fact-finder in workers' compensation cases, and, as such, credibility determinations and evaluations of evidentiary weight are solely within the WCJ's province. *Clear Channel Broadcasting v. Workers' Compensation Appeal Board (Perry)*, 938 A.2d 1150, 1156 (Pa.Cmwlth.2007).

An employee's injury is compensable under Section 301(c)(1) of the Workers' Compensation Act (Act), Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 411(1), if the injury (1) arises in the course of employment and (2) is causally related thereto. An injury may be sustained "in the course of employment" under Section 301(c)(1) of the Act in two distinct situations: (1) where the employee is injured on or off the employer's premises, while actually engaged in furtherance of the employer's business or affairs; or (2) where the employee, although not actually engaged in the furtherance of the employer's business or affairs, (a) is on the premises occupied or under the control of the employer, or upon which the employer's business or affairs are being carried on, (b) is required by the nature of his employment to be present on the employer's premises, and (c) sustains injuries caused by the condition of the premises or by operation of the employer's business or affairs thereon.

In the instant case, it is undisputed that Decedent was not on Penn State's premises when he fell, fractured and dislocated his shoulder, and, therefore, this case involves the first scenario presented under section 301(c)(1).

Of course, it has long been held that

[t]he Act is remedial in nature and intended to benefit workers; therefore, the phrase "actually engaged in the furtherance of the business or affairs of the employer" under Section 301(c)(1) of the Act must be given a liberal construction to effectuate the humanitarian objective of the Act. "To determine whether an employee was acting in the furtherance of the employer's business or affairs, courts consider the nature of the employment and conduct[,] a case specific inquiry." Whether the employee was acting in the course of employment at the time of injury is a question of law to be determined based on the factual findings made by the WCJ.

*Id.* at 640–641 (citations omitted).

Moreover,

[t]he general rule provides that employees are on their own time at lunch and an off-premises injury is not sustained in the course of one's employment. However, there are exceptions to this rule and the determination of whether or not [the employee] was in the course of [his] employment when [he] was injured revolves around whether [he] was actually engaged in the furtherance of [his] employer's affairs at that time.

*Carretti v. Schwanger*, 404 Pa.Super. 51, 589 A.2d 1165, 1167 (1991) (citing *Tatrai v. Presbyterian University Hospital*, 497 Pa. 247, 439 A.2d 1162 (1982)). This requirement translates into a direct or immediate furtherance of the employer's business affairs. *Id.*

Here, the record reflects that Decedent was a stationary employee, although he sometimes met his students off site for teaching purposes.[6] In particular, the WCJ found that Decedent had begun meeting with Wachhaus off campus to discuss his dissertation material because of the men's diametrically opposed teaching schedules at Penn State, (WCJ's Findings

---

**6.** We have analyzed the term "course of employment" differently, depending on whether a person is a traveling employee or a stationary employee. *Pesta v. Workmen's Compensation Appeal Board (Wise Foods)*, 153 Pa. Cmwlth. 616, 621 A.2d 1221, 1223 (1993). In cases involving traveling employees, "course of employment" is more broadly interpreted, and the employee is presumed to be engaged in the furtherance of his employer's business even if he or she deviates from the standard work routine for lunch or breaks. *Id.* Because Decedent was not a traveling employee, we will not discuss this distinction further.

of Fact, No. 15); that, after putting in their food orders, Decedent requested that their lunch be held until Decedent requested otherwise, (WCJ's Findings of Fact, No. 17); that Decedent and Wachhaus discussed in line-by-line, word-by-word detail the outline of Wachhaus' dissertation, (WCJ's Findings of Fact, No. 18); that Wachhaus believed his meeting with Decedent would last until 3:00 p.m. and that, "after they got their food," they would continue their discussion of scholarly topics related to their professions, (WCJ's Findings of Fact, No. 20).[7] Saliently, Wachhaus' credited testimony amply supports these findings, which indicate that the men planned a multiple-hour meeting, including a working lunch, in direct furtherance of Penn State's affairs. *See Speight v. Burens*, 371 Pa.Super. 478, 538 A.2d 542 (1988), wherein the employee "was acting in the furtherance of his employer's business when he went to lunch with his employer primarily to discuss business," *id.* at 545, and the employee was injured in a crash while he was a passenger in the vehicle that his employer was driving on return from the business lunch. *Id.* at 542–43.[8]

■ Furthermore, "it is well established that an employee is considered to have sustained an injury while actually engaged in the furtherance of an employers' [sic] business interests and affairs, where the injury occurred during [an] inconsequential or innocent departure from work within the regular working hours." *U.S. Airways*, 764 A.2d at 642 (relying on *Workmen's Compensation Appeal Board v. Borough of Plum*, 20 Pa.Cmwlth. 35, 340 A.2d 637 (1975)). On these facts, Decedent's trip to the salad bar cannot logically be construed as anything more than an inconsequential departure from his work as a professor, in which he was essentially engaged at the time.[9] Therefore, we reject Employer's contention that Decedent was not in the course and scope of his employment when he fell and sustained his shoulder injuries on October 20, 2006.

Next, Employer argues that Claimant failed to meet her burden of proving that Decedent's fall on October 20, 2006, sub-

---

7. In this last regard, Wachhaus testified:
 Q. Sir, was it your expectation when the dissertation paper was put away and the two of you went up to the salad bar, that for the remainder of time you spent at Charlie Brown's there wouldn't be any professional discussion?
 A. No, not at all.
 Q. Okay. What was your expectation?
 A. My expectation was that we would be at Charlie Brown's until I told him I had the [sic] leave.
 Q. And when would that have been?
 A. 3:00.
 Q. Okay. And what would you be discussing-what was your expectation of what you would be discussing after you, you know, got your meals?
 A. Public administration. He would talk about teaching, he would talk about methrological [sic] problems, the way that theories should be addressed in the field ... what scholars should be reading."

(N.T., 9/10/07, at 42.)

8. *Cf. Collins v. Workmen's Compensation Appeal Board (American Society for Testing and Materials)*, 99 Pa.Cmwlth. 228, 512 A.2d 1349 (1986) (providing that claimant was not entitled to benefits due to an injury she suffered while returning from a lunch that satisfied her own purposes but did not further the business of employer).

9. *Cf. Department of Labor and Industry v. Workers' Compensation Appeal Board (Savani)*, 977 A.2d 585, 590 (Pa.Cmwlth.2009) (providing that claimant, who was not furthering employer's business, was not entitled to benefits because her "injury did not occur during a small temporary departure from work to tend to her personal comforts or convenience, nor did it occur during an inconsequential or innocent departure from work").

stantially contributed to his death. In this regard, Employer asserts that Dr. Acri's testimony was equivocal on the issue of causation. Employer's argument lacks merit.

 The cases are clear that, where there are alleged competing causes for disability or death, the claimant must establish that the work-related injury was a substantial, contributing factor to that disability or death. *See Pokita v. Workmen's Compensation Appeal Board (U.S.Air)*, 163 Pa.Cmwlth. 97, 639 A.2d 1310, 1312 (1994). Moreover, "where no medical testimony exists in the record characterizing claimant's work-related injury as a substantial, contributing factor, the claimant cannot meet the requisite burden of proof as a matter of law." *Id.* (citing *Chicoine v. Workmen's Compensation Appeal Board (Transit Management Services)*, 159 Pa. Cmwlth. 362, 633 A.2d 658 (1993)).

Nevertheless, we explained in *Thomas Lindstrom Co. v. Workers' Compensation Appeal Board (Braun)*, 992 A.2d 961, 967 (Pa.Cmwlth.) (citations omitted), *appeal denied*, 608 Pa. 672, 13 A.3d 481, and *appeal denied*, 608 Pa. 670, 13 A.3d 480 (2010):

> [W]hen delivering a causation opinion in a workers' compensation case, a doctor or medical expert is not required to use magic words such as "substantial contributing factor," "materially contributed," or ... "cause in fact." Rather, "[i]t is only necessary that the doctor's testimony permit a valid inference that such causation was present."

 In this case, Employer argues that Dr. Acri's testimony was equivocal because he stated merely that Decedent's work contributed to his demise. Employer relies primarily on *Chicoine* to support its position, but we disagree that *Chicoine* controls. There, the claimant's medical expert, *on direct examination*, specifically declined to characterize the decedent's work as a substantial contributing factor leading to his death. Here, Dr. Acri, *on cross-examination*, positively asserted that Decedent's fall was a contributing factor to his death; however, he never stated anywhere in his testimony that it was not a substantial contributing factor.

More important, Dr. Acri testified at length on direct examination precisely how, in the doctor's opinion, Decedent's fall led to his death.

Q: Sir, can you identify what has been marked as Acri Deposition Exhibit 2?

A. Yes. This is a Discharge Summary summarizing the events of Dr. Rabin's admission and also disposition while at the Osteopathic Hospital.

Q. The final sentence of your summary states—quote—*the patient expired from multiple medical problems stemming from his unfortunate left upper extremity fracture*—end quote.

A. Correct.

Q. Could you tell us why you came to that conclusion? And when I say conclusion, it is the concluding sentence of your discharge summary.

A. Correct. *Multiple medical problems, of course, were from Jack's past that were re-exacerbated to the point to where this left upper extremity fracture that he sustained him [sic] caused him to go into complete body system failure, what we call multi-system organ failure.*

*And Jack's fracture unfortunately had caused such stress upon his body that it taxed it to the point to where the kidneys that were very, very borderline to begin with, that were stable, pushed him over the edge and went into renal failure. Cardiac wise, it stressed his heart to the point to where Jack was in a rapid afib which caused his heart to*

*fail. And also the fracture itself causing him to have all the pain that he was having induced a tremendous stress response that for days was left unchecked with him having this also suppressed his immune system to the point to where he ended up developing aseptic pneumonia while in the hospital.*

Now when you are diabetic, your immune system is already suppressed. It doesn't work right. Jack was on medications that also tended to somewhat suppress his immune system. *Now with this major stress of a fracture, for being left unattended to for days and him not getting the proper medical treatment at that point for days, just having his arm set, it pushed him over the edge. And when his body went into failure with his kidneys, with his heart, and his immune system, it led to a massive multisystem organ failure, septic shock and death.*

(N.T., 12/14/07, at 15–17 (emphasis added).) [10]

There can be no real question that Dr. Acri's testimony, which the WCJ found credible, permitted a valid inference that Decedent's fall and fracture on October 20, 2006, materially contributed to his death several weeks later. As such, Claimant met her burden of both production and persuasion. For all of the above reasons, we affirm.

Judge McCULLOUGH dissents.

### ORDER

AND NOW, this 15th day of August, 2012, the Workers' Compensation Appeal

---

**10.** Dr. Acri further testified that his opinion was based on a reasonable medical certainty. (N.T., 12/14/07, at 30.) Of course, in workers' compensation law, as in tort law, "an employer [takes] an employee as he comes." *RAG*

---

Board order, dated November 18, 2011, is hereby affirmed.

*(Cyprus) Emerald Resources, L.P. v. Workers' Compensation Appeal Board (Hopton)*, 590 Pa. 413, 429, 912 A.2d 1278, 1288 (2007) (citation omitted).