The MANITOWOC CO., INC. and Sentry Insurance, Petitioners

v.

WORKERS' COMPENSATION APPEAL BOARD (COWAN), Respondent.

Commonwealth Court of Pennsylvania.

Submitted on Briefs June 28, 2013.

Decided Aug. 20, 2013.

Colleen M. Pehanich, Scranton, for petitioners.

Bandy L. Jarosz, Gettysburg, for respondent Colt Cowan.

BEFORE: PELLEGRINI, President Judge, LEAVITT, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Senior Judge FRIEDMAN.

The Manitowoc Company, Inc., and Sentry Insurance (together, Employer) petition for review of the February 27, 2013, order of the Workers' Compensation Appeal Board (WCAB) affirming the decision of a workers' compensation judge (WCJ) to grant the fatal claim petition filed by Colt Cowan (Claimant). We affirm.

On August 31, 2010, Claimant[1] filed a fatal claim petition under section 301(c)(1) of the Workers' Compensation Act (Act)[2] alleging that his father, Jeffrey Cowan (Father), fell from a crane platform at work and later died as a result of the injuries he sustained from the fall. In his petition, Claimant sought dependent's benefits and funeral expenses. Employer filed an answer denying the material allegations in the petition but stipulating to Claimant's dependency.

On the morning of January 4, 2010, Father and co-worker Jerry Harmon were working on an elevated crane platform without harnesses. The platform was approximately six feet from the ground and had no handrails. While in a crouched position, Father said, "Hold it. Wait a minute." Harmon saw Father's eyes roll back, and Father fell off the platform, striking his head on the floor. Harmon testified that Father went limp and did not try to catch his fall. Within seconds of the fall, Father began turning blue and blood was coming out of his mouth. (WCJ's Findings of Fact, Nos. 3–4, 6–7, 11.)

Andy Keeseman, a certified emergency medical technician and Employer's first responder, rushed to the scene. When Keeseman arrived, Father was breathing slowly and had a faint pulse. Father did not respond to verbal stimuli but responded to a sternum rub. Father soon stopped breathing. Keeseman administered rescue breathing and chest compressions with the assistance of Kyle Hutchins.[3] Father began agonal respirations. The paramedics arrived, intubated Father, and transported him to the hospital. (WCJ's Findings of Fact, Nos. 18–26, 28–29.)

On January 10, 2010, diagnostic tests revealed that Father was brain dead, and he was disconnected from life support. The autopsy report stated that the cause of Father's death was cardiac dysrhythmia

---

1. Claimant was born on March 15, 2007. (WCJ's Findings of Fact, No. 2.)

2. Act of June 2, 1915, P.L. 736, as amended, 77 P.S. § 411(1).

3. Employees Hutchins and Kenneth Runk were present at the scene shortly after Father's fall.

due to mitral valve prolapse. (WCJ's Findings of Fact, Nos. 52–54.)

In support of his petition, Claimant presented the deposition and live testimony of Thomas R. Stoner, D.O., who is board-certified in internal medicine. Dr. Stoner explained that he could not be medically certain about Father's state of consciousness at the time of the fall because Father was not hooked up to any monitors. (N.T., 10/4/11, at 20, 57.) Dr. Stoner concluded, however, based on the observations of the multiple eyewitnesses, that Father did not experience cardiac arrest at the time of the fall "because once on the ground he clearly had a pulse and was breathing and not agonal." (Stoner Report, 5/26/11, at 2.) Dr. Stoner further opined that Father did not die from mitral regurgitation or heart disease; rather, Father's death was the direct result of falling onto his head, which caused a closed-head injury with a massive concussion and a diffuse axonal injury, leading to anoxic brain injury and cerebral edema. (WCJ's Findings of Fact, Nos. 48, 55, 57, 62; N.T., 10/4/11, at 48–49.)

Employer presented the deposition testimony of Paul M. Shipkin, M.D., a board-certified neurologist. Dr. Shipkin testified that as the paramedics intubated Father, they saw a moderate amount of blood and a large clot in Father's hypopharynx. There was no indication, however, that Father's airway was blocked. Because Father went limp and fell without trying to catch himself, Dr. Shipkin concluded that Father lost consciousness before he fell. Based on Father's preexisting mitral valve disease and the fact that he turned blue quickly, Dr. Shipkin testified that it was highly possible that a cardiac episode caused Father to lose consciousness. (WCJ's Findings of Fact, Nos. 66–68, 71–73.) Dr. Shipkin opined that Father's brain insult stemmed primarily from cardi-

ac arrhythmia and secondarily "from the whack on the head when he hit the floor." (Shipkin Dep., 4/6/11, at 51.) On cross-examination, Dr. Shipkin testified that the head trauma had little impact on Father's death because it did not cause bleeding in the brain and Father would have died whether or not he struck his head. (Id. at 93–94.)

Both Dr. Stoner and Dr. Shipkin agreed that Father suffered brain death. However, Dr. Stoner disagreed with Dr. Shipkin's opinion that a cardiac event was the primary cause of Father's death because Father had no cardiac arrhythmia while he was hospitalized until he was disconnected from life support. (WCJ's Findings of Fact, Nos. 59–60, 62, 81.) Dr. Stoner noted that Father had severe mitral valve disease, but that "was [the] only significant cardiac finding." (Stoner Report, 5/26/11, at 4.) Dr. Stoner also found it significant that the autopsy report showed neither a heart attack nor coronary artery disease. (Id.) Dr. Stoner explained:

> [Father] sustained more than a whack to the head. [He] fell 6 f[eet] off a crane platform and directly landed on his head onto a concrete floor sustaining a skull fracture and primary trauma-torque related midbrain hemorrhages with [a] severe concussion that affected his respirations and conscious state. [Father] tried to cling to life as his work mates assisted him and he continued to breath[e] through blood dripping down his hypopharynx around his trachea and eventual tracheal obstruction with a large blood clot and eventual hypnoxia and loss of pulse and v-fib cardiac arrest. Once his pulse was lost his brain didn't perfuse and he had resultant anoxic brain death.

(Id.)

Employer also presented the live testimony of Joseph Gascho, M.D., a

board-certified cardiologist. Dr. Gascho determined that Father had mitral valve prolapse and mitral regurgitation. Dr. Gascho opined that Father experienced ventricular fibrillation because of the mitral valve regurgitation, which lead to his anoxic brain injury and death. According to Dr. Gascho, ventricular fibrillation does not commonly result from head trauma unless there is bleeding in the brain. Dr. Gascho concluded that Father's diffuse brain swelling and anoxic encephalopathy were consistent with an acute cardiac event. (WCJ's Findings of Fact, Nos. 39–42.) In his written report, Dr. Gascho stated:

> That a cardiac arrhythmia was the cause of [Father's] loss of consciousness (which led to his fall off the platform) is consistent with the findings and events while [he was] hospitalized at Hershey Medical Center. . . .
>
> . . .
>
> It is my opinion that [Father's] death was ultimately related to the lethal cardiac arrhythmia and subsequent cardiac arrest. . . .
>
> It is my opinion that [Father's] fall from the platform was not the cause of his death but was secondary to the loss of consciousness that occurred prior to his fall and thus secondary to the likely cardiac arrhythmia.

(Gascho Report, 7/6/11, at 3–4.) [4]

On December 28, 2011, the WCJ granted Claimant's petition. The WCJ credited the testimony of Claimant's expert and concluded that (1) Father was injured in the course of his employment and (2) Fa-

ther's death was caused by the fall and resulting head trauma. (WCJ's Conclusions of Law, Nos. 1–2.) Employer timely appealed to the WCAB, which affirmed. Employer now petitions for review of that decision.[5]

Employer argues that the WCJ's decision is unsupported by substantial evidence. Specifically, Employer claims that Dr. Stoner's testimony, which the WCJ credited, was equivocal because he offered alternate theories regarding the exact cause of Father's death. We disagree.

To succeed on a fatal claim petition, the claimant has the burden of proving that the employee sustained a work-related injury and that the injury was a substantial, contributing cause of the employee's death. *See Gibson v. Workers' Compensation Appeal Board (Armco Stainless & Alloy Products)*, 580 Pa. 470, 479, 861 A.2d 938, 943 (2004); *Pennsylvania State University v. Workers' Compensation Appeal Board (Rabin)*, 53 A.3d 126, 133 (Pa.Cmwlth.2012), *appeal denied*, —— Pa. ——, 65 A.3d 415 (2013). Where the causal connection between the work injury and the death is not obvious, the claimant must present unequivocal medical evidence establishing the connection. *Rockwood Area School District v. Workmen's Compensation Appeal Board (Tipton)*, 98 Pa. Cmwlth. 309, 511 A.2d 263, 267 n. 4 (1986). Whether the record contains unequivocal medical evidence to prove causation is a question of law reviewable on appeal. *Bethlehem Mines Corporation v. Workmen's Compensation Appeal Board*

---

4. Employer also presented the deposition testimony of Michael Lee Brooks, M.D., a board-certified radiologist. Dr. Brooks' testimony and findings were largely consistent with Dr. Gascho's.

5. Our scope of review is limited to determining whether constitutional rights were violated, whether the adjudication is in accordance with the law, and whether necessary factual findings are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704.

*(James),* 108 Pa.Cmwlth. 68, 528 A.2d 1078, 1079 (1987).

At the hearing, Dr. Stoner set forth four possible explanations regarding the connection between Father's fall and his death: (1) the fall caused mid-brain hemorrhaging and death; (2) the fall caused a massive head injury, resulting in cardiac and respiratory arrest, anoxic brain injury, and death; (3) the fall caused a blood clot in the back of Father's throat, impairing his ability to breath and causing anoxic brain injury and death; or (4) the fall caused closed-head trauma, mid-brain hemorrhaging, secondary anoxic brain injury, and death. (N.T., 10/4/11, at 47–49.) Under each of these scenarios, however, Dr. Stoner's ultimate conclusion was that the fall and blunt-force head trauma caused Father's death. (*Id.* at 56; *see* Stoner Dep., 1/25/11, at 65.) Dr. Stoner also opined, "with a high degree of medical certainty," that absent the head trauma, Father would still be alive. (Stoner Report, 5/26/11, at 5; *see* WCJ's Findings of Fact, No. 59.)

█ The WCAB correctly concluded that an expert's mere offering of alternative analyses with respect to a work-related injury does not render the expert's testimony equivocal. To be unequivocal, the expert need only state that in his or her professional opinion, the result in question came from the assigned cause. *Corcoran v. Workers' Compensation Appeal Board (Capital Cities/Times Leader),* 725 A.2d 868, 872 (Pa.Cmwlth.1999). Expert testimony is competent even if the witness admits to uncertainty, doubt, reservation, or a lack of information with regard to certain medical details, as long as the witness does not recant the opinion first expressed. *Id.* Here, despite his uncertainty about the exact chain of physiological events, Dr. Stoner opined, at every stage of the litigation, that the fall and

head trauma caused Father's death. (*See* Stoner Dep., 1/25/11, at 65; Stoner Report, 5/26/11, at 4–5; N.T., 10/4/11, at 56.)

Employer also argues that Dr. Stoner admitted that an acute cardiac event "could have" caused Father to initially lose consciousness and fall from the platform. (N.T., 10/4/11, at 20.) That acknowledgement, however, does not render Dr. Stoner's testimony equivocal because Dr. Stoner conclusively determined that a cardiac event did not cause Father's death. Dr. Stoner opined, with a reasonable degree of medical certainty, that Father's fall and resulting head trauma caused his death. Therefore, the record contains substantial evidence to support the WCJ's findings.

█ Next, Employer argues that the WCJ failed to issue a reasoned decision and capriciously disregarded Employer's competent medical evidence. We disagree.

█ Section 422(a) of the Act requires the WCJ to render a reasoned decision that contains findings of fact and conclusions of law based on the record as a whole. 77 P.S. § 834. The WCJ must also concisely explain the rationale for his or her decision. *Id.* A decision is "reasoned" if it allows for adequate appellate review without the need for further explanation. *See Dorsey v. Workers' Compensation Appeal Board (Crossing Construction Company),* 893 A.2d 191, 194 (Pa. Cmwlth.2006).

Here, the WCJ set forth concise findings of fact and adequately explained the bases for his factual findings and credibility determinations. The WCJ found Dr. Stoner's testimony credible and persuasive because "[h]e had considerable experience in traumatic cases and this was a traumatic case." (WCJ's Op. at 12.) The WCJ also found that "Dr. Stoner had a better understanding of the actual sequence of events

as credibly presented by the various witnesses who were on the scene and rendered reports." (*Id.*)

Furthermore, the WCJ discredited the testimony of Employer's experts that a cardiac event caused Father's death and that the fall was not a substantial, contributing factor. The WCJ noted that Employer's experts reviewed the medical records but not the eyewitness testimony. Conversely, Dr. Stoner relied extensively on the eyewitness testimony regarding the sequence of events before and after Father's fall as well as the medical records. The WCJ also emphasized Dr. Stoner's considerable experience with traumatic-injury cases. Thus, the WCJ afforded greater weight to Dr. Stoner's testimony, as he was entitled to do. *See Rissi v. Workers' Compensation Appeal Board (Tony DePaul & Son)*, 808 A.2d 274, 278–79 (Pa.Cmwlth.2002) (stating that this court will not re-weigh the evidence or substitute its judgment for that of the WCJ, who is the ultimate factfinder and the sole arbiter of credibility). We find no error.

Finally, Employer argues that the WCJ improperly placed the burden on Employer to prove that Father's death did not result from his work injury. We disagree. Although the WCJ incorrectly stated that this matter is "a premises case," (WCJ's Op. at 11), the WCJ's decision demonstrates that he properly applied the burden of proof. The WCJ specifically concluded that Claimant proved "that [Father's] death was due to the fall and head trauma as established by the credible testimony of Dr. Stoner." (WCJ's Conclusions of Law, No. 2.)

Accordingly, we affirm the WCAB's order.

### ORDER

AND NOW, this *20th* day of *August*, 2013, we hereby affirm the February 27, 2013, order of the Workers' Compensation Appeal Board.

