# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Andrew Touchstone, c/o Teri  :
Touchstone,       :
      Petitioners :
          :
    v.     : No. 1336 C.D. 2018
          : Submitted: March 15, 2019
Workers' Compensation Appeal Board :
(Touchstone and Associates, P.C.), :
      Respondent :


BEFORE:  HONORABLE RENÉE COHN JUBELIRER, Judge
      HONORABLE ROBERT SIMPSON, Judge
      HONORABLE MICHAEL H. WOJCIK, Judge


**OPINION NOT REPORTED**


**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**     **FILED: July 29, 2019**


Teri Touchstone (Claimant) petitions for review of an Order of the Workers' Compensation Appeal Board (Board) that affirmed the decision of a Workers' Compensation Judge (WCJ) to deny the Fatal Claim Petition she filed on behalf of her husband Andrew Touchstone (Decedent). Claimant alleged Decedent suffered a fatal heart attack and that psychosocial stress related to his work as a workers' compensation attorney representing claimants, namely significant financial strain, was a substantial, contributing factor in his death. The WCJ denied the Fatal Claim Petition finding Claimant did not establish psychosocial stress was a substantial, contributing factor in Decedent's cardiac arrest. For the reasons that follow, we affirm.

## I.  BACKGROUND

On December 16, 2015, Claimant filed the Fatal Claim Petition, wherein she alleged Decedent suffered an acute myocardial infarction resulting in sudden cardiac arrest on October 21, 2014.  Touchstone & Associates P.C. (Employer) filed a timely answer denying all the material allegations.  The matter was assigned to a WCJ, who held numerous hearings.

### A.  The Testimony

Claimant testified in support of the Fatal Claim Petition as follows.[1]  Claimant and Decedent married in 1991 and have three children, all of whom are in college or graduate school.  Claimant started his own practice in 2005 and subsequently hired an associate attorney, Michael Bauerle.  Decedent went to the gym at least four or five times a week, hunted and trained dogs, did yardwork, and was active in his community.  He began treating for anxiety shortly after the birth of the couple's first daughter and was taking medication for it.  He was also taking medication to control his high blood pressure.  Several years ago, he underwent a heart ablation procedure, but was not under the care of a cardiologist for any extended period.  Decedent smoked half a pack of cigarettes or less per day since high school.  Because Decedent handled his own personal records, Claimant does not know if Decedent treated with anyone other than his family physician, whom he saw a handful of times, or if he complained about the amount of stress.

According to Claimant, Decedent typically left home by 9 a.m. and returned at rush hour.  After having dinner or a snack with his family, Decedent would go to the gym until 10 p.m.  From there, he would go to his office until 1 a.m. or 2 a.m.

---

[1] Claimant's testimony is summarized by the WCJ in Finding of Fact No. 1.  Her testimony also appears in the Reproduced Record at pages 9a-89a.

Claimant described occasions where Decedent returned home midday to lay down and returned to work after regrouping. On October 20, 2014, Claimant was in bed when Decedent returned home around 1 a.m. Claimant accidently locked Decedent out of the house, so she opened the door for him. They kissed, exchanged affectionate terms, and watched television in the bedroom. Decedent told Claimant he was going to work in the home office, and Claimant fell asleep. At approximately 5:20 a.m., Claimant was awoken by their dog. That is when she found Decedent on the floor.

Because Claimant is responsible for the household bills, she knew they were having a tough year, compared to 2013 and 2012. When Claimant asked for money to pay the bills, Decedent asked Claimant what was the least amount required. Claimant noticed Decedent was more stressed, overburdened, tense, and anxious in the year preceding his death. After her husband's death, Claimant was closing up the firm with an accountant when she found a number of unpaid bills, some of which were months overdue. Claimant did not work for the firm. Decedent ran the office by himself and did not share information about the firm with Claimant. Claimant had no knowledge about how many active cases Decedent had or how many were transferred to Attorney Jeffrey Gross upon Decedent's death.

Attorney Marc Vitale also testified before the WCJ on Claimant's behalf.[2] Attorney Vitale met Decedent in the mid-1990s, after which they became social acquaintances. Decedent also rented office space from Attorney Vitale. As a result, Attorney Vitale knew Decedent worked long hours, even staying at the office overnight sometimes. Beginning in early 2014, Attorney Vitale noticed a change in Decedent's personality and demeanor. While Decedent was normally gregarious

---

[2] Attorney Vitale's testimony is summarized by the WCJ in Finding of Fact No. 2. His testimony also appears in the Reproduced Record at pages 100a-28a.

and friendly, he became very short-tempered and angry. Additionally, "[h]e would grouse about what was happening with his cases and the profession." (WCJ Finding of Fact (FOF) ¶ 2.c.) Attorney Vitale observed Decedent with his shoulders down and avoiding eye contact. He had not observed Decedent being stressed prior to the last six months before he died. Decedent obtained a new source of referrals for cases, but they were costly to fund and having to advance costs was normal. Decedent paid rent late in 2014, but Attorney Vitale could not recall if he was ever late paying rent in prior years. Decedent was also late paying Attorney Vitale a fee they shared on a case. But, Attorney Vitale was not sure if Decedent received the fee, if all the bills that were submitted were paid, or if the case was appealed.

Attorney Gross, who assumed Decedent's cases upon his death, also testified before the WCJ as follows.[3] Attorney Gross met Decedent long ago as opposing counsel and they became friends. When Decedent was considering starting his own practice, he approached Attorney Gross to discuss what was involved in representing claimants, as compared to defendants. Attorney Gross advised Decedent of what to expect economically, politically, socially, and in terms of time. He also knew Decedent was concerned and stressed about the state of workers' compensation, including court decisions becoming more conservative and legislative changes. He was approached by Attorney Bauerle after Decedent's passing about what would happen to the practice. Attorney Gross assumed responsibility for 100 of Decedent's cases and hired Attorney Bauerle and Decedent's administrative assistant. Many of the files he assumed had little work performed on them, which required a number of extension requests for medical depositions.

---

[3] Attorney Gross's testimony is summarized by the WCJ in Finding of Fact No. 3. His testimony also appears in the Reproduced Record at pages 129a-52a.

4

Attorney Bauerle, Decedent's associate, testified before the WCJ on Claimant's behalf as follows.[4] He knew Decedent for more than 20 years but did not join Decedent's firm until 2009. In addition to handling cases, Attorney Bauerle assisted with marketing and developing the firm's website. Upon learning of Decedent's death, Attorney Bauerle made a spreadsheet of the 100 cases for which Attorney Gross eventually assumed control. Decedent and Attorney Bauerle maintained their own caseload. The year before Decedent died, 2013, was a very good year for the firm. A union started referring cases to the firm in 2014. However, because of the procedural posture of the cases, immediate outlay of capital was required. In 2014, Attorney "Bauerle noticed a gradual change in Decedent's demeanor." (FOF ¶ 4.d.) Specifically, he noticed Decedent was more concerned about getting money for a case, asking within one week of settlement whether the funds had been received. Previously, Decedent was "very affable, good hearted, and a kind individual," not "upset, histrionic, or perturbed." (*Id.*) Because he had not seen the firm's books, Attorney Bauerle did not have direct knowledge of a cash flow issue. The fee structure under which he was paid "collapsed" in 2014 when he was paid his base salary but not certain fees that were owed. (*Id.* ¶ 4.e.) Decedent at times asked Attorney Bauerle to obtain additional time from WCJs to obtain depositions.

In support of the Fatal Claim Petition, Claimant also presented the deposition testimony of Nicholas DePace, M.D., who testified as follows.[5] Decedent was found at home on the floor and was 51 years old when he died. He last treated with his

---

[4] Attorney Bauerle's testimony is summarized by the WCJ in Finding of Fact No. 4. His testimony also appears in the Reproduced Record at pages 153a-76a.

[5] Dr. DePace's testimony is summarized by the WCJ in Finding of Fact No. 5. His testimony also appears in the Reproduced Record at pages 183a-225a.

5

family physician on April 18, 2014. Review of records from his family physician indicated that Decedent treated for chronic hypertension and was prescribed blood pressure medication. The records also reflected Decedent treated for anxiety for several years and underwent a "supraventricular tachycardia albated [sic] with an electrophysiology procedure" in the 1990s. (FOF ¶ 5.d.) Decedent had a family history of coronary artery disease, had smoked for many years, and had high cholesterol and hyperlipidemia. Because Decedent's medical records were incomplete, Dr. DePace did not know if Decedent took the prescribed statin or if the statin was effective. He reviewed an affidavit from Attorney Bauerle, which described Decedent's work life and changes to behavior before his death. "Dr. DePace understood that Decedent exercised almost daily, was physically fit and not sedentary, was somewhat of a workaholic and put in an inordinate amount of time at the office, hours late at home, and had very little sleep time." (*Id.* ¶ 5.b.) In the last several months prior to his death, Decedent experienced significant stress due to work, deadlines, and court decisions. His behavior changed. Specifically, he was more angry and irritable. This "anxiety, urgency, agitation, and anger" was a type of psychosocial stress that Dr. DePace attributed to Decedent's work. (*Id.* ¶ 5.c.) Dr. DePace further testified that he believed Decedent was stressed about money but saw no indication that insurance carriers were not timely paying claims. Sudden cardiac death, especially in males, Dr. DePace explained, occurs within a short amount of time and is usually arrhythmic based, and arrhythmia is "almost always" caused by coronary artery disease. Smoking, high lipid values, being overweight, possibly genetics, and psychosocial stress were risk factors for coronary artery disease that Decedent possessed. According to Dr. DePace, a major risk factor for heart attacks was a high level of psychosocial stress. Dr. DePace did not believe that

6

sleep apnea was a possible cause of Decedent's death because people suffering from sleep apnea could not work 12-plus hours, like Decedent did. Rather, Decedent would be falling asleep often and unable to maintain his schedule. Moreover, people who die from sleep apnea are usually more overweight than Decedent. Furthermore, Decedent did not die in bed, so Dr. DePace did not believe sleep apnea was a cause of his death. Dr. DePace opined that Decedent's work was a substantial contributing factor in his death based upon the testimony of Claimant, Attorney Vitale, and Attorney Bauerle, as well as two medical records received from Decedent's family physician. He further opined that there is a temporal relationship between Decedent's death and a trigger, such as anger, which doubles the risk of sudden cardiac arrest when occurring within two hours of irregular arrhythmia.

In opposition to the Fatal Claim Petition, Employer presented the deposition testimony of Craig Frankil, M.D., who testified as follows.[6] A review of Decedent's medical records revealed Decedent had a supraventricular tachycardia, which was treated successfully in 1991, chronic hypertension, and dyslipidemia. Decedent also smoked and was overweight. Decedent regularly worked out, but Dr. Frankil did not know what those workouts involved. Decedent's cholesterol was 239, and his triglycerides and LDL cholesterol were high. In reviewing the records, Dr. Frankil saw no evidence that Decedent's blood pressure was ever "optimal." (FOF ¶ 6.b.) Based upon Claimant's description of Decedent's breathing, Dr. Frankil believed this was evidence of apneic episodes, which was also reflected in the medical records as a concern of Decedent's family physician.

Decedent's death certificate, completed by Decedent's family physician, lists as causes of death: "1) cardiopulmonary arrest, 2) myocardial infarction, and 3)

---

[6] Dr. Frankil's testimony is summarized by the WCJ in Finding of Fact No. 6. His testimony also appears in the Reproduced Record at pages 283a-341a.

atherosclerotic cardiovascular disease." (*Id.* ¶ 6.a.) Dr. Frankil, however, does not believe cardiopulmonary arrest is a proper cause of death because it is a terminal event. In addition, Dr. Frankil found no evidence of a myocardial infarction or reported symptoms of coronary artery disease in the days before Decedent's death, such as shortness of breath, or pain in the chest, arm, jaw, or back. Nor did Dr. Frankil find any outward evidence or documentation in the medical records of Decedent having atherosclerotic cardiovascular disease or prior plaquing of the arteries, although he acknowledged Decedent was at risk. Decedent's family physician recommended testing for this, but there was no record of it ever being performed. According to Dr. Frankil, someone may have multiple risk factors but not have coronary artery disease, or someone may have no risk factors but have bad coronary artery disease. Without coronary artery disease, he did not believe psychosocial stress could cause a myocardial infarction and provided two examples to support this opinion. Dr. Frankil explained there are other causes of sudden death, including some that Decedent had a greater likelihood of experiencing. Differential diagnoses included hypertensive stroke based upon Decedent's hypertension, which was not optimally managed, or subarachnoid hemorrhage or aortic dissection based upon Decedent's history of hypertension, smoking, and dyslipidemia. Decedent's hypertension could cause left ventricular hypertrophy and fibrosis, which, in turn, would put Decedent at risk of fatal arrhythmia.

In terms of Decedent's death, Dr. Frankil explained the only thing known for certain was that Decedent died suddenly between 1:00 a.m. and 5:30 a.m. According to Dr. Frankil, there is a "trend" for myocardial infarctions to occur based on circadian rhythms in the morning upon waking and between 6:00 a.m. to 6:00 p.m. than overnight or between 6:00 p.m. and 6:00 a.m., when sudden death from sleep

8

apnea is more likely to occur. (FOF ¶ 6.g.) Dr. Frankil opined Decedent died from sleep apnea or a hypertensive crisis.

## B. WCJ's Decision

Based upon the above evidence, the WCJ concluded Claimant did not meet her burden of establishing that psychosocial stress, specifically, financial strain, was a substantial contributing factor in Decedent's death. In reaching this conclusion, the WCJ found the testimony of Claimant, Attorney Vitale, Attorney Gross, and Attorney Bauerle "credible as to [their] observations of Decedent." (*Id.* ¶¶ 7-10.) With regard to Claimant's testimony, the WCJ further found "Decedent kept his medical matters mostly to himself, [so] it is unclear whether a complete and accurate medical history was available." (*Id.* ¶ 7.) The WCJ similarly found Decedent kept business to himself, so "while it may be Claimant's observation and impression that financial matters were causing Decedent's behavioral changes in 2014, there is no tangible evidence that this was the cause." (*Id.*) To the extent Claimant testified college expenses for the couple's children was a concern, the WCJ noted trusts had been established to cover those costs. He also noted that Claimant acknowledged finances varied from year to year.

Concerning the testimony of the attorney witnesses, the WCJ credited Attorney Vitale's testimony that Decedent was late on some rent payments in 2014, but noted Attorney Vitale "could not say with certainty that there had not been other late rent payments between 2007[] and 2013." (*Id.* ¶ 8.) The WCJ likewise found that Attorney Vitale's "[t]estimony regarding outstanding fees from a shared case lacked specificity to know whether the failure to pay the fee was based on lack of funds." (*Id.*) Turning to Attorney Gross's testimony, the WCJ credited his

testimony about the condition of the cases he assumed. However, the WCJ further found that "[w]hile it is believed that many depositions needed to be taken on cases, there was no tangible evidence that those depositions were not taken due to lack of funds." (*Id.* ¶ 9.) Finally, as to Attorney Bauerle's testimony, the WCJ found credible his description of how cases were handled among Decedent and himself and that the influx of cases from the new referral showed promise. "However," the WCJ found, "[Attorney] Bauerle was not privy to the financial books of the firm and could not say with certainty what the actual financial condition of the firm was." (*Id.* ¶ 10.)

With regard to the two expert witnesses, Dr. DePace and Dr. Frankil, the WCJ found "the opinions of Dr. Frankil to state what more likely happened on October 21, 2014, between 1 AM and 5:20 AM." (*Id.* ¶ 11.) Because Decedent never underwent recommended testing, the WCJ found "there is no medical proof that Decedent had coronary artery disease, so the medical experts [we]re left to some conjecture after analyzing the information available." (*Id.*) The WCJ also noted that "[n]either expert had a forensic accounting to demonstrate the degree of financial stress of the firm, if any," and "[n]one of the fact witnesses were in a position to provide any detail as to the extent of financial stress, if any." (*Id.*) The WCJ continued:

> Dr. DePace's report states that there is a temporal relationship between the trigger and the death. Claimant's testimony of the night at issue portrays a normal time of relaxation, with no apparent trigger. [Dr. DePace] further states that the death could not have been the result of sleep apnea because [Decedent] did not die in bed. Dr. DePace presumes that Decedent could not have fallen asleep in the home office during what would have been normal sleeping hours. The undersigned cannot accept this speculation. Dr. Frankil offers differential diagnoses of the death which are unrelated to work. The undersigned finds significant Dr. Frankil's testimony that myocardial infarction usually occurs upon waking or during the day hours and sudden death from sleep apnea is more common at night.

10

(*Id.*)

Finally, the WCJ found that while "there may have been some financial strain, the degree of financial strain on the law firm was not proven." (*Id.* ¶ 12.) As a result, the WCJ, while sympathetic to Claimant, was "constrained to find that psychosocial stress as a result of financial strain was not a substantial contributing factor in the premature death of Decedent." (*Id.*) Accordingly, the WCJ denied the Fatal Claim Petition.

## C. Board's Opinion

Claimant appealed the WCJ's Decision to the Board, arguing the WCJ capriciously disregarded uncontested evidence that shows Decedent's death was the result of psychosocial stress related to his work. After summarizing the WCJ's findings, the Board determined the WCJ did not capriciously disregard the evidence. Instead, the Board noted that the WCJ thoroughly reviewed the evidence and explained her credibility determinations. Although the WCJ credited the lay witnesses' testimony, the Board determined the WCJ still found the testimony "insufficient to establish that Decedent's death was substantially caused by work-related psychosocial stress due to any alleged financial strain on his business." (Board Opinion (Op.) at 8.)

The Board also rejected Claimant's contention that the WCJ's finding that Claimant did not meet her burden on the Fatal Claim Petition was not supported by substantial, competent evidence. The Board explained that the WCJ did not credit Claimant's expert, Dr. DePace, and credited Employer's expert, Dr. Frankil, instead. Therefore, Claimant did not provide unequivocal medical evidence, as required, to show work-related stress substantially contributed to Decedent's death. (*Id.* at 8-9.)

11

Accordingly, the Board affirmed the WCJ's Decision. Claimant now petitions for review of the Board's Order.

## II. PARTIES' ARGUMENTS

On appeal,[7] Claimant argues the WCJ capriciously disregarded uncontested evidence and made findings of fact that were not supported by substantial evidence. Specifically, Claimant argues the WCJ found all of the lay witnesses who testified as to Decedent's financial stress credible but yet, in Finding of Fact No. 12, determined that Claimant did not prove "the degree of financial strain." (Claimant's Brief (Br.) at 26 (quoting FOF ¶ 12).) According to Claimant, the record confirms that Decedent was under a significant amount of stress as evidenced by a 50 percent reduction in his income and Decedent's inability to pay the costs of litigation, referral fees, his associate's wages, and rent. Therefore, Claimant argues a forensic accounting, as suggested by the WCJ, was not necessary. In addition, Claimant challenges Finding of Fact No. 11, in which the WCJ credited Dr. Frankil's opinion concerning Decedent's cause of death over Dr. DePace's opinion. Claimant contends Dr. DePace provided unequivocal testimony that Decedent's work-related financial stress was a substantial contributing factor in his death. On the other hand, Claimant asserts "Dr. Frankil could not provide a definitive opinion regarding the cause of [Decedent's] death" and "merely outlined the alternative possibilities that could have caused the sudden death generally in an individual," which Dr. DePace

---

[7] "Our standard of review is limited to a determination of whether there has been a violation of constitutional rights, whether an error of law has been committed, or whether all necessary findings of fact are supported by substantial evidence." *Markle v. Workers' Comp. Appeal Bd. (Bucknell Univ.)*, 785 A.2d 151, 153 n.2 (Pa. Cmwlth. 2001). When reviewing questions of law, our review is plenary. *Land O'Lakes, Inc. v. Workers' Comp. Appeal Bd. (Todd)*, 942 A.2d 933, 936 n.3 (Pa. Cmwlth. 2008).

12

ruled out as possibilities. (*Id.* at 37, 39 (quotation marks omitted).) Claimant argues the WCJ erred in "accept[ing] the equivocal theories of . . . Dr. Frankil." (*Id.* at 27.) Claimant asks the Court to vacate the Board's Order affirming the WCJ's Decision and remand "for findings of fact consistent with the acknowledgment that [Claimant] established the existence of significant work[-]related psychosocial stress," and "[w]ith this finding corrected, the medical evidence can be properly weighed." (*Id.* at 42.)

Employer argues that the WCJ's Decision is supported by substantial, competent evidence. Employer asserts "[t]he WCJ went into great detail . . . addressing why each [lay] witness[es]' testimony did not prove financial stress." (Employer's Br. at 8.) Specifically, Employer argues the WCJ found Claimant lacked knowledge of the financial status of the firm because Decedent kept that information to himself; Attorney Vitale did not provide any specifics on late rental payments or late referral fees; Attorney Gross produced no tangible proof that the depositions in the cases he took over were not taken because of finances; and Attorney Bauerle lacked knowledge of the firm's finances, acknowledged being paid base wages regularly, and admitted the new referral source looked promising. Because these witnesses testified live before the WCJ, Employer contends the WCJ had the opportunity to listen to their testimony and observe their demeanor, which she could take into consideration in making her credibility determinations. Further, because there was no credited evidence that the firm was financially strained, Employer contends there was also no factual basis to support the opinion of Claimant's expert, Dr. DePace. Moreover, Employer argues that the WCJ's reference to the lack of a forensic accounting was not the only reason the WCJ rejected Claimant's argument that financial stress was a substantial factor in

13

Decedent's death. Employer notes the WCJ's finding also was based upon the lack of evidence provided by Claimant or her three lay witnesses. Employer also argues that the WCJ rejected Dr. DePace's opinion as to causation, and without establishing causation, Claimant could not prevail on her Fatal Claim Petition. Employer argues the WCJ's decision to accept Dr. Frankil's opinion that sleep apnea was the more likely cause of Decedent's death, was within the WCJ's province as the fact finder.

## III. DISCUSSION

Claimant first argues the WCJ capriciously disregarded evidence related to the amount of stress Decedent was under at work. A capricious disregard of evidence occurs when there is a "deliberate and baseless disregard of apparently trustworthy evidence." *Williams v. Workers' Comp. Appeal Bd. (USX Corp.-Fairless Works)*, 862 A.2d 137, 144 (Pa. Cmwlth. 2004); *see also Leon E. Wintermyer, Inc. v. Workers' Comp. Appeal Bd. (Marlowe),* 812 A.2d 478, 487 n.12 (Pa. 2002) (defining capricious disregard as a "deliberate disregard of competent evidence which one of ordinary intelligence could not possibly have avoided in reaching a result"). Our Supreme Court has stated that "where there is substantial evidence[8] to support an agency's factual findings, and those findings in turn support the conclusions, it should remain a **rare instance** in which an appellate court would

---

[8] Substantial evidence is defined as "relevant evidence that a 'reasonable person might accept as adequate to support a conclusion.'" *Pocono Mountain Sch. Dist. v. Workers' Comp. Appeal Bd. (Easterling)*, 113 A.3d 909, 918 (Pa. Cmwlth. 2015) (quoting *Wieczorkowski v. Workers' Comp. Appeal Bd. (LTV Steel),* 871 A.2d 884, 890 (Pa. Cmwlth. 2005)). When reviewing a WCJ decision for substantial evidence, we must view the evidence in the light most favorable to the prevailing party and draw all reasonable inferences in the prevailing party's favor. *Id.* It is important to note that "it is irrelevant whether the record contains evidence to support findings other than those made by the WCJ; the critical inquiry is whether there is evidence to support the findings actually made." *Lahr Mech. v. Workers' Comp. Appeal Bd. (Floyd),* 933 A.2d 1095, 1101 (Pa. Cmwlth. 2007) (citation omitted).

disturb an adjudication based upon capricious disregard." *Wintermyer*, 812 A.2d at 487 n.14 (emphasis added). Additionally, "where the WCJ discusses the evidence in question, but rejects it as less credible or assigns it less evidentiary weight than other evidence, the WCJ's determination does not constitute a capricious disregard of that evidence." *Grimm v. Workers' Comp. Appeal Bd. (Fed. Express Corp.)*, 176 A.3d 1045, 1054 (Pa. Cmwlth.), *petition for allowance of appeal denied*, 189 A.3d 385 (Pa. 2018). When reviewing a WCJ's decision, we must be cognizant that the WCJ is "the ultimate fact finder" and as such "has exclusive province over questions of credibility and evidentiary weight, and is free to accept or reject the testimony of any witness . . . in whole or in part." *Williams*, 862 A.2d at 143. "[A]s fact finder, the WCJ is not required to accept even uncontradicted testimony." *Id.* at 144 (citing *Capasso v. Workers' Comp. Appeal Bd. (RACS Assocs., Inc.)*, 851 A.2d 997, 1002 (Pa. Cmwlth. 2004)). However, while

> generally a [WCJ] may disregard the testimony of any witness, even though the testimony is uncontradicted, [a WCJ] does not have the discretion to capriciously disregard competent evidence without a reasonable explanation or without specifically discrediting it. . . . At the very least the findings and conclusions of the fact finder must have a rational basis in the evidence of record and demonstrate an appreciation and correct application of underlying principles of substantive law to that evidence. . . . When a [WCJ] rejects uncontradicted evidence and makes findings or conclusions which have no rational basis in the evidence of record, that [WCJ] capriciously disregards competent evidence. Simply stated, a [WCJ] may not "reject" credible and uncontradicted medical evidence without explaining why the evidence is "rejected."

*Acme Mkts., Inc. v. Workmen's Comp. Appeal Bd. (Pilvalis)*, 597 A.2d 294, 296-97 (Pa. Cmwlth. 1991) (internal citations omitted).

Here, Claimant argues the WCJ capriciously disregarded her testimony and the testimony of three other lay witnesses who all testified as to the financial strain Decedent was under and how it impacted him. Claimant argues the WCJ credited each of these witnesses' testimony, yet found no evidence of the extent of this financial strain. Importantly, however, the WCJ did not wholesale credit these witnesses, as Claimant suggests. Rather, the WCJ credited these witnesses only to the extent of their "observations of Decedent." (FOF ¶¶ 7-10.) The WCJ went on to qualify the finding as to each witness. Concerning Claimant, the WCJ noted she testified Decedent kept his health and the firm's finances to himself; therefore, the WCJ found "there [wa]s no tangible evidence that" the financial matters caused the observed changes in Decedent's behavior. (*Id.* ¶ 7.) Instead, the WCJ found it was Claimant's "impression" that it was the cause. (*Id.*) The WCJ's findings as to the other lay witnesses also contained caveats. For instance, with regard to Attorney Vitale, the WCJ found Attorney Vitale could not recall if Decedent was late on rent in previous years, which would undercut Claimant's position. (*Id.* ¶ 8.) As for Attorney Gross, the WCJ found "no tangible evidence" that Decedent did not take the outstanding depositions in the cases Attorney Gross assumed for lack of funds. (*Id.* ¶ 9.) The WCJ also found that Attorney Bauerle "was not privy to the financial books of the firm and could not say with certainty what the actual financial condition of the firm was." (*Id.* ¶ 10.)

These findings go to the weight that the WCJ gave the witnesses' testimony, which was within the sole province of the WCJ. *Williams*, 862 A.2d at 143. Furthermore, "where the WCJ discusses the evidence in question," as the WCJ did here, "but rejects it as less credible or assigns it less evidentiary weight than other evidence," also as the WCJ did here, the WCJ has not capriciously disregarded that

16

evidence. *Grimm*, 176 A.3d at 1054. As we stated in *Williams*, there is a "crucial distinction between a rejection of a witness's testimony[] and the capricious disregard thereof." 862 A.2d at 145. We further stated that the "capricious disregard standard is not to be applied in such a manner as would intrude upon an agency's fact[]finding rule and discretionary decision making." *Id.* at 146.

Here, the WCJ did not capriciously disregard evidence. Rather, the WCJ, as fact finder, heard the testimony firsthand, made credibility determinations, and weighed the evidence presented. The WCJ thoroughly explained her thought process, and Finding of Fact No. 12, which states Decedent was under some financial strain, but the degree of strain was not established, is supported by the testimony outlined above. Accordingly, we cannot find that the WCJ capriciously disregarded evidence.

Nor can we find that the WCJ erred in rejecting Claimant's expert and crediting Employer's expert, whose testimony the Claimant argues was equivocal. It bears repeating that the WCJ is "the ultimate fact finder . . . and is free to accept or reject the testimony of any witness, including a medical witness, in whole or in part." *Id.* at 143. That is exactly what the WCJ did here. The WCJ credited Dr. Frankil's theory of what happened to Decedent over Dr. DePace's theory. To prevail on a fatal claim petition, a claimant must show: (1) the employee sustained a work-related injury, and (2) that the injury was a substantial, contributing cause of the employee's death. *Manitowoc Co., Inc. v. Workers' Comp. Appeal Bd. (Cowan)*, 74 A.3d 1137, 1141 (Pa. Cmwlth. 2013). If the causal connection between work and the death is not obvious, a claimant is required to present unequivocal medical evidence establishing the causal link. *Id.* The fact that Dr. DePace agreed with the cause of death listed in the death certificate is not determinative. While death

certificates are admissible in workers' compensation cases, death certificates are not conclusive proof of cause of death. *Patton v. Workers' Comp. Appeal Bd. (Lane Enters., Inc.)*, 958 A.2d 1126, 1134 (Pa. Cmwlth. 2008). A WCJ may reject the cause of death on the death certificate, just as a WCJ may reject a witness's testimony. It is the WCJ's "prerogative as the fact[]finder." *Id.* at 1135. Since the WCJ did not credit Dr. DePace's theory that work-related stress was a substantial, contributing cause of Decedent's death, Claimant did not meet her burden.

To the extent Claimant argues that the WCJ could not credit Dr. Frankil's testimony because it was equivocal,[9] we disagree for two reasons. First, even if Dr. Frankil's testimony was equivocal and, therefore, incompetent as a matter of law, Claimant still could not prevail because the burden was on **her** and she did not meet **her** burden of proof. *See Stalworth v. Workers' Comp. Appeal Bd. (Cty. of Delaware)*, 815 A.2d 23, 29-30 (Pa. Cmwlth. 2002) (finding that although the opinion of the employer's medical expert was equivocal, the WCJ rejected the testimony of the claimant's medical expert, and as a result, the claimant did not satisfy the burden of proof). Because this was a fatal claim petition, Employer did not have the burden of proof. In fact, although not doing so would probably not have been prudent, Employer was not required to present an expert.

Second, Dr. Frankil's testimony was not equivocal. Medical testimony is "equivocal if it is based only upon possibilities, is vague, and leaves doubt." *Amandeo v. Workers' Comp. Appeal Bd. (Conagra Foods)*, 37 A.3d 72, 80 (Pa. Cmwlth. 2012) (quotation omitted). The medical expert's testimony must be reviewed "as a whole and [we] may not base our analysis on a few words taken out of context." *Id.* Furthermore, "[t]here are no magic words that a doctor must recite

---

[9] "[W]hether testimony is equivocal is a question of law that is fully subject to our review." *Stalworth v. Workers' Comp. Appeal Bd. (Cty. of Delaware)*, 815 A.2d 23, 29 (Pa. Cmwlth. 2002).

18

to establish causation." *Campbell v. Workers' Comp. Appeal Bd. (Pittsburgh Post Gazette)*, 954 A.2d 726, 730 (Pa. Cmwlth. 2008). "There is no requirement that every utterance that escapes the lips of a medical witness . . . must be certain, positive, and without reservation, exception, or paradventure of a doubt in order to be considered unequivocal." *Id.* "[I]f a medical expert testifie[d], after providing foundation for the testimony, that, in [the expert's] professional opinion, [the expert] believes or thinks a fact exists," the testimony is unequivocal. *O'Neill v. Workers' Comp. Appeal Bd. (News Corp., Ltd.)*, 29 A.3d 50, 57 (Pa. Cmwlth. 2011). The "mere offering of alternative analyses with respect to a work-related injury does not render the expert's testimony equivocal." *Manitowoc Co., Inc.*, 74 A.3d at 1142. Nor is an expert required to "rule out with absolute certainty other factors that may have caused or contributed to a condition." *Campbell*, 954 A.2d at 730.

Here, when Dr. Frankil's testimony is examined as a whole, it is apparent he believed Decedent did not die from a heart attack caused by stress, but from either sleep apnea or a hypertensive crisis. (Reproduced Record at 315a.) Dr. Frankil thoroughly explained why he did not think Decedent suffered a myocardial infarction. (*Id.* at 296a, 309a-312a.) He saw no evidence of myocardial infarction or coronary artery disease. (*Id.* at 309a-10a.) He also explained why he did not believe psychosocial stress could induce myocardial infarction without evidence of coronary artery disease, an opinion he reiterated on cross-examination. (*Id.* at 311a-12a, 326a.) Myocardial infarction, Dr. Frankil explained, is predominantly caused by plaque rupturing. Because stress does not cause plaque, he reasoned that stress cannot cause myocardial infarction in plaque's absence. (*Id.* at 312a.) Dr. Frankil acknowledged that literature would say the myocardial infarction was most likely the cause of death, but he questioned the accuracy of the data since it was based on

19

the cause of death listed in death certificates, without regard to whether an autopsy was performed to confirm the cause of death. (*Id.* at 306a.) Dr. Frankil opined "there's a high likelihood that the cause of death in [Decedent] was not a[] [myocardial infarction]." (*Id.* at 315a.)

Dr. Frankil did testify in general as to a number of other potential causes of sudden death in someone Decedent's age. (*Id.* at 300a-03a.) However, he then offered differential diagnoses specific to Decedent. (*Id.* at 303a.) He testified Claimant's description of Decedent's snoring episodes was important evidence of "apneic episodes followed by regaining of breath." (*Id.* at 294a.) Decedent's medical records also indicated suspicion of sleep apnea. Although he admitted sleep apnea was speculative, as were all conditions without the benefit of an autopsy, he was "highly suspicious" of it. (*Id.* at 305a, 332a.) Dr. Frankil supported his theory by explaining that the time of day of Decedent's death was more indicative of sudden death as a result of sleep apnea than sudden death as a result of myocardial infarction. (*Id.* at 310a-11a.) He called sleep apnea "one of the leading causes" of Decedent's death, in his professional medical opinion, as was a hypertensive crisis based upon Decedent's medical history. (*Id.* at 315a.) Taken as a whole, we cannot say Dr. Frankil's opinion was equivocal. *See Kondrat v. Workmen's Comp. Appeal Bd. (Westinghouse Elec. Corp.)*, 603 A.2d 689, 692 (Pa. Cmwlth. 1992) (holding expert's testimony that expert "fe[lt] very strongly" about the decedent's cause of death was "neither equivocal nor ambiguous"). Accordingly, we discern no error in the WCJ's reasoning.

20

## IV. CONCLUSION

Because the WCJ did not capriciously disregard evidence, but rather made credibility determinations and weighed the evidence presented, we must affirm the Board's affirmance of the WCJ's Decision.

_____
**RENÉE COHN JUBELIRER,** Judge


Judge McCullough did not participate in the decision in this case.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Andrew Touchstone, c/o Teri Touchstone, | : | |
| Petitioners | : | |
| | : | |
| v. | : | No. 1336 C.D. 2018 |
| | : | |
| Workers' Compensation Appeal Board (Touchstone and Associates, P.C.), | : | |
| Respondent | : | |

# **O R D E R**

**NOW**, July 29, 2019, the Order of the Workers' Compensation Appeal Board, in the above-captioned matter, is **AFFIRMED.**

_____
**RENÉE COHN JUBELIRER,** Judge